[No. 24631. Department Two. January 24, 1934.]

CONTINENTAL COAL COMPANY, *Respondent,* v. UNITED FUEL COMPANY *et al., Appellants.*

CONTINENTAL COAL COMPANY, *Respondent,* v. FOLGER PEABODY *et al., Appellants.*

UNITED FUEL COMPANY, *Appellant,* v. CONTINENTAL COAL COMPANY, *Respondent,* SEATTLE SCHOOL DISTRICT No. 1, *Appellant.*[1]

*Bogle, Bogle & Gates* and *Ray Dumett,* for appellants United Fuel Co. *et al.*

*Robert M. Burgunder, Arthur M. Hare,* and *David J. Williams,* for appellant Seattle School Dist. No. 1.

*Harroun, Maloy & Shidler,* for respondent.

[1]Reported in 29 P. (2d) 395.

GERAGHTY, J.—Three actions, involving different phases of what is essentially one controversy, were consolidated in the lower court for purposes of trial, and are so treated here upon appeal.

July 22, 1931, Seattle School District No. 1 (hereafter referred to as the "district") and the United Fuel Company (hereafter referred to as "United") entered into an agreement by the terms of which the United agreed to sell and deliver to the district its coal requirements for the year ending August 31, 1932. This contract was awarded to the United upon a bid submitted to the district on or about June 26, 1931. The contract required the delivery of large quantities of N. P. steam coal No. 3 to various schools in the city of Seattle. This coal was marketed solely by the Continental Coal Company (hereafter referred to as "Continental"), and, before awarding the contract to the United, the district requested some assurance from the Continental that, if the contract was awarded, the United would be in a position to deliver. The Continental gave the district a letter, which read:

"Please be advised that the United Fuel Company is our duly accredited agent in bidding your coal requirements for the school year ending August 31, 1932; and that we hereby guarantee analysis, quality of coal required, as bid."

Also, on or about the 26th of June, Continental and United entered into a contract by the terms of which Continental agreed to supply the United the coal it would require, if its bid was accepted by the district.

The United commenced delivering coal to the schools in the early part of August, and deliveries continued until January 28, 1932, on which day the fires in two schools went out, owing, as it was found, to the defective quality of the coal delivered by the United. After the burning out of the fires in the two schools,

the district officials caused an investigation to be made, which led them to the conclusion that large quantities of inferior free burning screenings had been supplied to the district since the beginning of delivery under the United's contract, all of it being billed and delivered as N. P. No. 3 steam coal. The United also investigated and reached the same conclusion, based upon information received from its truck drivers and others.

After considerable investigation and negotiation, the district, in April, 1932, deducted the sum of $1,999.54 from the amounts due the United for coal delivered, having reached the conclusion that the district was damaged in this amount. This deduction was reported to the United, and the United billed the district for the amount then due, less the deduction. The amount so billed was paid by the district. While the term "penalty" is used in the record, as the trial court said in a note appended to its findings, the term is used not in the sense of "fine," but rather "deduction."

Prior to this time, the district had made another deduction in the sum of $190.36, for coal supplied in the months of November and December. This sum, however, was deducted without knowledge of the substitution of an inferior coal, and was based upon tests which would not disclose the substitution of different coal.

As a result of its discovery of the substitution of inferior coal, the district canceled its contract with the United. The United brought an action against the Continental for damages in the sum of sixty thousand dollars, alleged to have been sustained by it through the cancellation of its contract resulting from the delivery to it by the Continental of the inferior coal. Upon the filing of this suit by the United, the Continental brought suit against the United for money due, and prayed for a receiver. Another suit was brought by the Continental against Folger Peabody,

Alexander Peabody and E. L. Breene, principal stockholders of the United, who had guaranteed payment of its bills to the Continental. The application of the Continental for a receiver was continued from time to time, until on July 9, 1932, a written stipulation was entered into between Continental, United, the Peabodys and Breene, in which it was agreed that all matters in litigation between them should be deemed settled, except the question whether the Continental had delivered any free burning screenings, described as defective and inferior coal, and whether the district had a legal right to retain all or any part of the money held by it as a penalty.

Up to this time, the district was not a party to any of the pending litigation. After the signing of the stipulation, and in pursuance of its terms, the Continental filed an amended answer and cross-complaint in the action brought against it by the United, and also brought the district into the case as an additional defendant. The United answered the cross-complaint of the Continental, and in turn filed a cross-complaint against the Continental. Later, the Continental dismissed the district from the action, whereupon the United filed a supplemental answer and cross-complaint, again bringing the district into the action. The district's objections to its inclusion as an additional defendant having been overruled, it filed an answer.

With this maze of pleadings, the consolidated actions came on for trial before the court without a jury. For the purposes of the trial, the court assumed Continental's amended answer and cross-complaint to be the primary pleading or complaint. In its cross-complaint as it stood after the dismissal of the district, the Continental demanded judgment for $1,999.54 against the United, on account of balance due for coal

delivered between September 1, 1931, and January 28, 1932.

The United, in its answer and supplemental answer and cross-complaint against the Continental and district, alleged that the Continental, in its contract of June 26, 1931, with the United, guaranteed the quality of the coal which was to be furnished the district, and agreed to assume all penalties imposed by the district with respect to the coal. It alleged that the Continental failed to deliver the coal specified in its contract, and instead, fraudulently furnished approximately 1,350 tons of defective and inferior coal, wrongfully represented and invoiced as the coal specified in the contract, the coal so delivered being, in fact, yard screenings, fines, and other and inferior coals, unsuited for the use of the district, and deceptively mixed with small quantities of the coal contracted for. It alleged that the district, because of the delivery of such defective and inferior coal, had canceled its contract with the United and withheld from the United the sum of $1,999.54, as a penalty for the delivery of such defective and inferior coal, which penalty was a legal obligation of the Continental to assume.

The United further alleged that it had always been, and it then was, its position and contention that the penalty of $1,999.54 was duly, regularly and properly imposed by the district, and had been, and then was, legally withheld by the district; that, if its position in this respect be correct, the Continental was legally obligated to assume the penalty, and that the court should so require; but if the court should find the Continental correct in its contention that the penalty, or any part, was wrongfully or improperly imposed by the district, the court should require Continental to assert its claim directly against the district and the fund withheld by it, and not against United, and that the court

should render judgment accordingly against the district and the fund.

The district, in its answer, followed substantially the averments of United's cross-complaint, with respect to the fraudulent delivery of defective and inferior coal, in violation of the terms of the contract of July 22nd. It also pleaded accord and satisfaction with the United.

The court made findings of fact, in which it found that, immediately prior to June 26, 1931, the Continental and United were interested in having the district use in its schools in the city of Seattle a certain coal known as "N. P. No. 3 steam coal," as well as certain other coals for which the Continental was the wholesale distributor in the city of Seattle; that, prior to this time, the district had determined, after years of experimentation and study, that N. P. No. 3 steam coal was a high quality coking coal, and the most economical and efficient for use by the district in certain of its schools; that this was known to both Continental and United, both companies having furnished coal to the district for a number of years prior thereto; that, on June 26, 1931, Continental and United entered into a contract, by the terms of which the Continental agreed to furnish certain specified coals to United for delivery to the district, among which was N. P. No. 3 steam coal; that, pursuant to the demand of the district, and in order to secure acceptance of the United's bid, the Continental gave the district the letter heretofore referred to.

The court found the execution of the contract of July 22, 1931, between the United and the district, for delivery of coal for the year ending August 31, 1932; that, pursuant to this contract, the district from time to time, during the period between August 8, 1931, and January 28, 1932, ordered from the United, and the

United in turn ordered from the Continental, 1,110.45 tons of N. P. No. 3 steam coal, at the contract price of $5.28 per ton, and 294.55 tons at the contract price of $5.34 per ton; that, upon receipt of these orders, the Continental loaded into the trucks of the United at the bunkers of the Continental, for delivery to schools of the district, a total of 1,405 tons of coal; that every load of coal so delivered was accompanied by a written invoice, or delivery ticket, representing the coal to be N. P. No. 3 steam, as ordered by the district; that all of the originals of said invoices, or delivery tickets, were made out by the Continental, and most of the copies of the originals, which were delivered to the district, were also made out by the Continental, except in a few instances; that all of the coal so delivered prior to November 1, 1931, 494.95 tons, was N. P. No. 3 steam coal, and conformed to the orders of the district and the contract of July 22nd; that, from November 1, 1931, to January 28, 1932, however, the Continental, in breach of its express and implied warranties, billings and invoices to the United and to the district, and in violation of the specific orders received for such coal and of the contracts of June 26 and July 22, 1931,

" . . . knowingly, secretly, and deceitfully loaded into the trucks of the United Fuel Company, at the bunkers of the Continental Coal Company at Seattle, Washington, for delivery to the schools of the school district, 455 tons of defective and inferior free burning screenings, lacking the well known coking qualities of N. P. No. 3 steam coal, which defective and inferior coal was wrongfully represented, invoiced and billed by Continental Coal Company to be the N. P. No. 3 steam coal specified in the orders received therefor, and specified in the above mentioned letters and contracts of June 26, June 27 and July 22, 1931; whereas, in truth and in fact, as said Continental Coal Company well knew, said 455 tons of coal were not said N. P. No. 3 steam coal, but on the contrary consisted of free

burning yard screenings of a defective and inferior quality, unsuited for the use of said school district, and deceptively mixed by said Continental Coal Company with small quantities of said N. P. No. 3 steam coal, approximately one-half of each load delivered during said period consisting of the above mentioned defective coals, and the other one-half consisting of N. P. No. 3 steam coal. That at all times herein mentioned N. P. No. 3 steam coal was and is a high quality coking coal, which in burning gives off its heat slowly and produces maximum efficiency and economy in heating the school plants of the school district above mentioned. That, on the other hand, the free burning screenings, delivered as aforesaid to the school district, burn quickly, give off their heat rapidly, form clinkers which prevent the proper operation of the school heating plants, and make it difficult to maintain a proper and even temperature in the schools.''

The court further found that, at all times, the district duly sampled and tested all coal delivered, in substantial compliance with the provisions of the contract of July 22, 1931, but that the sampling and tests did not and could not disclose the fact that the coal delivered consisted of a quantity of N. P. No. 3 steam coal, deceptively mixed with an equal quantity of defective and inferior free burning screenings; that the district and the United relied upon the Continental's guarantees, representations, warranties and invoices, and had no knowledge prior to January 28, 1932, that the coal delivered was not as warranted, guaranteed, billed and invoiced by Continental.

The court found that the district's penalty or deduction of $1,999.54 was excessive, in that the district did not have a legal right to withhold or deduct any sum on account of coal delivered prior to November 1, 1931, and also that the district, in arriving at the amount of its penalty or deduction, fixed the fair cash market value of the 455 tons of inferior coal at $2.12 per ton,

whereas the fair cash market value, delivered at the schools, of this inferior coal was $3.12 per ton; that the district had a right to withhold and deduct as a penalty, on account of the defective coal delivered subsequent to November 1st, $948.01 only, and that from this sum there should be deducted $190.36, previously withheld by the district as a penalty, leaving a balance of $757.65, the amount which the district then had the legal right to retain and withhold. The United commenced delivering coal to the district August 8, 1931, and from that date up to November 1st, delivered, as the court found, 494.95 tons. The court found that the coal so delivered complied with the terms of the contract.

The court awarded the Continental judgment in the sum of $1,241.89 against the United, and the Peabodys and Breene, its guarantors, and a judgment in like sum against the district in favor of the United. The United, Peabody *et al.*, and the district appeal.

The trial of the cause consumed seven days. The evidence on the issue of fraud was conflicting, but we think it fully sustains the findings of the trial court on that issue. Since the respondent, Continental, is standing here upon its judgment and does not challenge the findings, it is unnecessary to enter into a detailed discussion of the evidence.

In two respects, we think the court did not find as strongly against the respondent as the evidence warranted. The first is with respect to the coal delivered prior to November 1st, some 490 tons. The court found that this coal was delivered in compliance with the terms of the contract. All of the evidence sustaining the court's findings as to the substitution of inferior coal in the deliveries subsequent to November 1st was equally convincing as to the existence of the same practice of substitution during the period prior to

November 1st. But the trial court seemed to think that, because no complaint had been made in the course of those months, no allowance should be made appellant school district. During this period, there was not so great a requirement for heat, and naturally the school janitors and custodians would not have brought home to them the inferior character of the coal as strongly as in the late fall and winter months. As we have seen, the court found that the inferior coal, mixed as it was with the better grade, could not be detected either from appearance or by sampling or testing.

So, too, as to the court's finding that the inferior coal had a market value at the bunker of $2.12 per ton. It might be true that, for some uses and at some plants, the coal would have that value, but we think the court's own findings negative any suggestion that it had this or any substantial value to the schools for which it was delivered, whose heating plants were not adapted to its use. However, in view of the conclusion we have reached on what we believe to be the controlling issue in the case, we need not discuss these points at greater length.

The trial court, in characterizing the course of dealing of the respondent, expressed regret that there was not a rule of law denying respondent recovery for the inferior coal delivered in violation of its contract.

Now, we do not conceive the law to be so impotent that it must, perforce, through a strained construction of rules intended to protect honest dealing, lend a helping hand in aid of the effort of the dishonest to extricate themselves from the web in which they have become enmeshed by their own deceitful practices. And we need look no further than the decisions of this court for the rule sought by the trial judge.

In *Schmidt v. North Yakima,* 12 Wash. 121, 40 Pac. 790, where a contractor, who had clandestinely employed inferior materials in performing a contract for the city of North Yakima, sued to recover a balance alleged to be due him, this court denied the contractor's right to recover, saying:

"But there is another proposition which precludes the appellant from recovering in this case at all. It was determined in *Dermott v. Jones,* 2 Wall. 1, that, where a contractor has been guilty of fraud, he cannot recover in any form of action."

That case was referred to, with approval, in *Mortimer v. Dirks,* 57 Wash. 402, 107 Pac. 184, where recovery was denied a contractor, who sued for a balance due on a contract for the erection of a dwelling, where it was found that he had "skinned" the job.

"The appellant, according to the findings of fact, 'knowingly and intentionally violated the terms of his contract.' No statement of facts being before us, we must accept such a finding with all its probative force. In addition, the court finds that prior to commencing the work the appellant stated that he intended 'to skin the job so as to make some money.' With such a situation before us, we cannot invoke any equitable rule for appellant's protection. As against the respondents, he is guilty of a fraud, and he cannot recover in this or any other form of action." *Mortimer v. Dirks,* 57 Wash. 402, 107 Pac. 184.

"When, therefore, the appellant persisted in following his own plan and ignoring that of the city engineer, he in law wilfully and fraudulently violated his contract, and cannot make it the basis for now insisting that the city make him the payments specified to be paid him upon the completion of the contract." *Mallory v. Olympia,* 75 Wash. 245, 134 Pac. 914.

"We have no doubt that if the evidence showed bad faith on the part of the contractor, he would not be entitled to recover." *Evans v. Goist,* 90 Wash. 100, 155 Pac. 780.

The evidence shows that the district has paid, and that the Continental has received, more than the contract price of all N. P. No. 3 steam coal received by the district. The district did not contract for, and did not want, the screenings delivered to its schools. It did not know of their delivery, and they were used only because they were deceptively mixed with the good coal in a way to escape detection. The district knew the superior quality of N. P. No. 3 steam coal and its adaptability for use in certain of its schools. It was so concerned to be certain of this coal that it was not satisfied to have the United's contract alone, but procured further the Continental's written undertaking that the coal would be supplied. To permit a recovery to the Continental under the court's findings and the record would be a perversion of justice.

The judgment of the trial court will be reversed, the causes remanded with direction to dismiss, and the appellants shall have their costs.

BEALS, C. J., BLAKE, TOLMAN, and HOLCOMB, JJ., concur.